**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THE NEW YORK TIMES COMPANY,

      Plaintiff,

             v.

FEDERAL BUREAU OF INVESTIGATION,

      Defendant.

                               **No. 22 CV 3590 (JPO)**

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR**
**SUMMARY JUDGMENT AND OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Of Counsel:
Samantha Hamilton
(Not Admitted in S.D.N.Y.)

David E. McCraw
Dana R. Green
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Facsimile: (212) 556-1009
Email: mccraw@nytimes.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 1

ARGUMENT ........................................................................................................................... 7

I.      The FBI Bears the Burden of Justifying Withholding .................................................7

II.     The FBI's Public Declaration Fails to Provide a Basis for Withholding the BAU
        Report in Full .................................................................................................................9

        A.      The Government's Claimed Exemptions Require Certain Factual Showings ........ 9

        B.      The FBI Fails to Make the Factual Showings Required by Exemption 7 ............ 12

III.    The FBI Fails to Show Why Redaction is Not Feasible to Address Exempt
        Material ........................................................................................................................16

IV.     The State Department's Waiver of Exemption 7(E) Calls Into Question the FBI's
        Withholding On That Basis ..........................................................................................18

V.      Information Subject to Exemptions 6 and 7(C) May Readily Be Redacted and
        Those Exemptions Are Not an Obstacle to Disclosure..................................................18

CONCLUSION....................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. DHS,*
243 F. Supp. 3d 393 (S.D.N.Y. 2017)......................................................................................11

*ACLU v. DOJ,*
2014 WL 956303 (S.D.N.Y. March 11, 2014) .......................................................................10

*ACLU v. DOJ,*
901 F.3d 125 (2d Cir. 2018)....................................................................................................8

*Allard K. Lowenstein Int'l Hum. Rights Project v. DHS,*
603 F. Supp. 2d 354 (D. Conn. 2009).............................................................................10, 11

*Associated Press v. DOD,*
554 F.3d 274 (2d Cir. 2009).....................................................................................................7

*Citizens for Resp. & Ethics in Wash. v. DOJ,*
658 F. Supp. 2d 217 (D.D.C. 2009) ....................................................................................9, 10

*Clevenger v. DOJ,*
2020 WL 1846565 (E.D.N.Y. Apr. 3, 2020) .........................................................................15

*CNN v. FBI,*
293 F. Supp. 3d 59 (D.D.C. 2018) .........................................................................................10

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,*
405 F. Supp. 3d 127 (D.D.C. 2019).......................................................................................11

*Dep't of Air Force v. Rose,*
425 U.S. 352 (1976) .................................................................................................................7

*Doherty v. DOJ,*
775 F.2d 49 (2d Cir. 1985).....................................................................................................12

*Elec. Privacy Info. Ctr. v. DHS,*
777 F.3d 518 (D.C. Cir. 2015).................................................................................................7

*Florez v. CIA,*
829 F.3d 178 (2d Cir. 2016)...................................................................................................16

*Founding Church of Scientology of D.C. v. NSA,*
610 F.2d 824 (D.C. Cir. 1979)...............................................................................................10

*Juarez v. DOJ*,
 518 F.3d 54 (D.C. Cir. 2008) ............................................................................................9

*Kay v. FCC*,
 976 F. Supp. 23 (D.D.C. 1997) ........................................................................................9

*Lawyers Comm. for Human Rights v. INS*,
 721 F. Supp. 552 (S.D.N.Y. 1989) ..................................................................................8

*Majuc v. DOJ*,
 2019 WL 4394843 (D.D.C. Sept. 13, 2019) ..................................................................10

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
 566 F.2d 242 (D.C. Cir. 1977) ........................................................................................7

*Mermerlstein v. DOJ*,
 2021 WL 3455314 (E.D.N.Y. Aug. 4, 2021) ................................................................15

*Milner v. Dep't of Navy*,
 562 U.S. 562 (2011) .........................................................................................................7

*Morley v. CIA*,
 508 F.3d 1108 (D.C. Cir. 2007) ......................................................................................7

*Pratt v. Webster*,
 673 F.2d 408 (D.C. Cir. 1982) ........................................................................................9

*Reps. Comm. for Freedom of the Press v. CBP*,
 567 F. Supp. 3d 97 (D.D.C. 2021) .............................................................................11, 14

*Reps. Comm. for Freedom of the Press v. FBI*,
 3 F.4th 350 (D.C. Cir. 2021) ..................................................................................8, 13, 14

*Schwartz v. DEA*,
 2016 WL 154089 (E.D.N.Y. Jan. 8, 2016) ...................................................................10

*Seife v. FDA*,
 43 F.4th 231 (2d Cir. 2022) ....................................................................................7, 8, 13

*Staehr v. Hartford Fin. Servs. Grp.*,
 547 F.3d 406 (2d Cir. 2008) ............................................................................................2

*Sussman v. U.S. Marshals Serv.*,
 494 F.3d 1106 (D.C. Cir. 2007) ......................................................................................8

*Tushnet v. ICE*,
 246 F. Supp. 3d 422 (D.D.C. 2017) ..............................................................................11

*U.S. Dep't of State v. Ray*,
    502 U.S. 164 (1991) ...................................................................................................7

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009)........................................................................................16

**Statutes**

Freedom of Information Act, 5 U.S.C. § 552 ........................................................... *passim*

**Other Authorities**

Fed. R. Evid. 201(b).......................................................................................................2

*FOIA Guidelines*, Office of the Att'y Gen. (Mar. 15, 2022)  .......................................14

Plaintiff The New York Times Company ("The Times") respectfully submits this memorandum of law in support of its cross-motion for summary judgment and in opposition to Defendant Federal Bureau of Investigation's ("FBI") motion for summary judgment in this action brought pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## PRELIMINARY STATEMENT

For six years, U.S. officials and their family members overseas have reported experiencing disturbing and sometimes debilitating medical events, often preceded by loud or unusual noises. This phenomenon, first reported in Cuba, is commonly referred to as "Havana Syndrome." The Government has yet to identify the cause of these medical events—and at times has questioned the legitimacy of them—raising serious questions about the Government's handling of the incidents, its treatment of its own employees, and its willingness to be transparent with the public about the potential risks and threats.

In this case, The Times sought one report, prepared by the FBI, that could shed light on these matters of substantial public interest. The FBI has denied that request in full, claiming that not a single word of the report can be released. The FBI's secrecy makes little sense given how forthcoming other agencies have been about their investigations into Havana Syndrome and the public nature of much of the evidence. And the FBI has failed to make the kind of factual showing that is needed to justify such withholding under FOIA. The FBI also has failed to demonstrate that redaction of any exempt material is not feasible.

## FACTUAL BACKGROUND

In December 2016, officials at U.S. and Canadian diplomatic posts in Havana, Cuba began reporting hearing strange and unexplained noises, followed by a cluster of medical symptoms, including "cognitive, vestibular, and oculomotor dysfunction as well as sleep disorder

1

and headache." *Havana, Cuba Accountability Review Board Report*, U.S. Dep't of State (June 2018) ("ARB Report"), https://tinyurl.com/5b8cm49d (Declaration of Dana R. Green (Green Decl.) Ex. 1) at 1; Compl. (Dkt. 1) ¶ 8.[1] The symptoms came to be known as "Havana Syndrome." Subsequent cases have been reported by U.S. personnel elsewhere in the world, including China, Russia, and Uzbekistan. ARB Report at 2. Yet, six years later, the nature and cause of the malady remain a mystery.

*The FBI's Behavioral Analysis Unit Report*

Multiple Government agencies have conducted investigations into the syndrome. At issue in this litigation is the report from one of them: a report prepared by the FBI Behavioral Analysis Unit (the "BAU Report"). It has been widely reported, but never confirmed by the Government, that the BAU Report concluded that affected individuals were not victims of a crime, but instead were suffering from a mass psychogenic illness. *See, e.g.*, Adam Entous, *Vienna Is the New Havana Syndrome Hot Spot*, The New Yorker (July 16, 2021), https://tinyurl.com/duca36dc, at 4;[2] Sean Power & Michael Miner, *Report – Havana Syndrome: American Officials Under Attack*, Belfer Ctr. for Sci. & Int'l Affs., Harvard Kennedy Sch. (Nov. 4, 2021), https://tinyurl.com/9hyvwyre (Green Decl. Ex. 3) at 7.[3] Reportedly, the BAU conducted no interviews and performed no tests, instead relying on prior interview transcripts and civilian medical records. *Entous* at 4 (The BAU Report "was based on transcripts of previous interviews

---

[1] A court may properly take judicial notice of matters "generally known" or coming from sources "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

[2] The articles remain available online. For the convenience of the Court, a copy of The New Yorker article is attached as Exhibit 2 to the Green Declaration.

[3] The Court may properly take judicial notice of such reports for the fact of their existence, rather than the truth of their contents. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

that the F.B.I. had done with some of the patients, and on 'patient histories' compiled by the individuals' doctors, who had already ruled out mass psychogenic illness as the cause").

*Government Disclosures about Havana Syndrome*

While the BAU Report has been kept confidential by the FBI, the Government has officially acknowledged much about Havana Syndrome. For example, in 2018 the State Department ("DOS") commissioned an investigation and report, which it later declassified and published in redacted form. *Acoustic Signals and Physiological Effects on U.S. Diplomats in Cuba*, JASON (Nov. 2018) ("DOS JASON Report"), https://tinyurl.com/3m2pbn88 (Green Decl. Ex. 4). The report included detailed information about the evidence and methodology of the investigation, including the kind of electronic evidence available and the kind of medical tests U.S. officials underwent. *Id.* The DOS JASON Report was unable to "precisely determine the nature of these incidents" but concluded that the medical symptoms were real. *Id*. at 6.

DOS also convened an Accountability Review Board (the "Board") to review the matter; the Board released its report in 2019. ARB Report, *supra*. The Board's report was a study of the adequacy and conduct of the Government's response to reports of Havana Syndrome, and provided a detailed account of the Government's actions and various investigations. It disclosed that the DOS, upon learning about affected individuals' reports, arranged for the medical evacuation of affected DOS employees and their families to the University of Pennsylvania Center for Brain Injury and Repair, where they received comprehensive multidisciplinary evaluations. *Id*. at 2. The Board opined that the DOS's response was "characterized by a lack of senior leadership, ineffective communication, and systemic disorganization," finding that "interagency response was stove-piped and largely ad hoc." *Id*. It also revealed that no formal risk-benefit analysis of U.S. government presence in Havana had ever been conducted. *Id*.

3

The Centers for Disease Control and Prevention ("CDC") also investigated Havana Syndrome and published a report in 2019. *Cuba Unexplained Events Investigation – Final Report*, Centers for Disease Control & Prevention (Dec. 3, 2019) ("CDC Report"), https://tinyurl.com/5n8cj7sp (Green Decl. Ex. 5). The CDC abstracted medical data for 95 individuals collected by the DOS, University of Miami, University of Pennsylvania, and the National Institutes of Health to collect specific information in order to formulate an epidemiological case definition for Havana Syndrome. *Id*. at 2. Among the 95 individuals' medical reports, the CDC cataloged symptoms such as disorientation, head pressure, headache, nausea, auditory symptoms, cognitive deficits, vestibular changes, and vision changes, notating whether these symptoms presented at initial onset or subsequent onset, *i.e.*, whether symptoms appeared close in time to initial reporting of symptoms, or appeared weeks or months later. *Id*. at 5-6. The CDC Report found that the most commonly reported initial symptoms were headache, nausea, and auditory symptoms, and the most commonly reported symptoms of subsequent onset were vestibular disturbances and cognitive deficits. *Id*. at 5.

Even the Director of National Intelligence and the Central Intelligence Agency partially declassified and released the results of a report regarding their joint investigation into Havana Syndrome. *See Complementary Efforts on Anomalous Health Incidents – Exec. Summary* (Feb. 2, 2022) ("IC Report"), https://tinyurl.com/yf7xcncb (Green Decl. Ex. 6).

In addition, multiple U.S. officials have spoken publicly about Havana Syndrome and the Government's response. *See, e.g.*, *Secretary Antony J. Blinken On the Department's Health Incidents Response Task Force*, Dep't of State (Nov. 5, 2021), https://tinyurl.com/ye9hcj8u (Green Decl. Ex. 7). It has been the subject of extensive public discussion by members of Congress and, in October 2021, President Biden signed into law an act to compensate individuals

4

affected by the mysterious condition. *See Helping American Victims Afflicted by Neurological Attacks Act of 2021*, S.1828, 117th Cong. (2021), https://tinyurl.com/35r85nc6.

The CDC Report and—reportedly—the BAU Report relied in large part not on government investigatory materials but on civilian clinical examinations and studies conducted at the University of Miami, the University of Pennsylvania, and Dalhousie University in Halifax, Nova Scotia. *See* Randel L. Swanson, et al., *Neurological Manifestations Among US Government Personnel Reporting Directional Audible and Sensory Phenomena in Havana, Cuba*, JAMA (Mar. 20, 2018), https://tinyurl.com/4s7k4fvr; Michael .E. Hoffer, et al., *Acute findings in an acquired neurosensory dysfunction*, Laryngoscope Investigative Otolaryngology (Dec. 12, 2018), https://tinyurl.com/bubznj7k; Alon Friedman, et al., *Havana Syndrome: Neuroanatomical and Neurofunctional Assessment in Acquired Brain Injury Due to Unknown Etiology* (May 24, 2019), https://tinyurl.com/3x44hyh8. Those studies conducted expert clinical examinations of dozens of individuals affected by Havana Syndrome or potentially exposed to it, including interviews, cognitive assessments, blood tests, physical examinations, vision tests, hearing tests, balance tests, neuropsychological tests, MRI brain imaging, magnetoencephalography, and (in one case) a post-mortem.

The National Academies of Sciences ("NASEM") also conducted a study of Havana Syndrome with funding from DOS; its report was released in 2020. *An Assessment of Illness in U.S. Gov't Emps. and Their Families at Overseas Embassies*, Nat'l Academies of Scis., Eng'g, & Med. (2020) ("NASEM Report"), https://doi.org/10.17226/25889 (Green Decl. Ex. 8). The NASEM Report relied on anonymized clinical data gathered by the teams at the University of Miami, University of Pennsylvania, and Dalhousie University, anonymized "detailed multi-disciplinary clinical diagnoses of all patients" evaluated by the National Institutes of Health, and

interviews with former Embassy personnel suffering from the syndrome. *Id.* at 10. NASEM also had access to the CDC's final report and received information from the DOS's Bureau of Medical Services. *Id.* at 8. The NASEM suggested that "directed radio frequency energy attack" was the most plausible explanation. *Id.* at 17-20. It considered the possibility of mass psychogenic illness but opined that without more epidemiological evidence to support it, "a retrospective diagnosis of mass psychogenic illness is considered to be speculative at best and subject to necessary criticism." *Id.* at 27.

*The Times's Request and the Government's Response*

On December 9, 2021, The Times submitted a FOIA request to the FBI, seeking a copy of the BAU Report. Declaration of Michael G. Seidel, dated November 10, 2022 ("Seidel Decl.") Ex. A. The FBI acknowledged receipt of the request on December 15, 2021. *Id.* ¶ 6 and Ex. B. The FBI did not timely respond to the request and The Times filed this lawsuit on May 4, 2022. *Id.* ¶ 7; Dkt. 1. In the course of this litigation, the FBI ultimately concluded not to release any part of the BAU Report. Seidel Decl. ¶ 8. It cited FOIA Exemptions 7(A) and 7(E), 5 U.S.C. § 552(b)(7)(A), (E), and in part FOIA Exemptions 6 and 7(C), 5 U.S.C. § 552(b)(6), (7)(C). Exemption 7(A) pertains to active investigations or proceedings. Exemption 7(E) allows agencies to keep certain law enforcement techniques and policies secret. The remaining exemptions cited (Exemptions 6 and 7(C)) govern privacy.

The view that the BAU Report is a sensitive law enforcement document is not shared across the Government. The FBI has revealed in this litigation that it consulted with the DOS concerning whether to release the BAU Report. Seidel Decl. ¶ 4. The DOS initially asserted Exemptions 7(C) and 7(E), *id.* ¶ 8, but the FBI states that "[u]pon further review of the BAU Report, DOS is withdrawing its assertion of FOIA Exemption 7(E)." *Id.* ¶ 11.

**ARGUMENT**

### I.   The FBI Bears the Burden of Justifying Withholding

The purpose of the Freedom of Information Act is to provide access to government records. *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) ("Congress enacted the FOIA in order to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976))). That presumption of access may be overcome only in certain defined circumstances. "FOIA 'mandates that an agency disclose records on request, unless they fall within one of nine exemptions.'" *Elec. Privacy Info. Ctr. v. DHS*, 777 F.3d 518, 522 (D.C. Cir. 2015) (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011)).

FOIA exemptions "are to be construed narrowly," and the agency seeking to deny access bears the burden of justifying withholding. *Associated Press v. DOD*, 554 F.3d 274, 283 (2d Cir. 2009) (There is a "strong presumption in favor of disclosure [that] places the burden on the agency to justify the withholding of any requested documents." (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). "All doubts are resolved in favor of disclosure." *Seife v. FDA*, 43 F.4th 231, 235 (2d Cir. 2022).

To meet that burden, an agency must make specific showings. It must "provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977). *See* 5 U.S.C. § 552(b) (requiring the government to disclose "the exemption under which [each] deletion [to a record] is made"). An agency must show that its explanation of the

applicability of an exemption is logical and plausible. *ACLU v. DOJ*, 901 F.3d 125, 133 (2d Cir. 2018).

The agency must also demonstrate that its withholding is no greater than necessary. For each piece of withheld information, the agency must show "that the information withheld is not reasonably segregable." *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 560, 567 n.15 (S.D.N.Y. 1989) ("[T]he scant CIA affidavits do not indicate that CIA has fulfilled its duty to provide even reasonable segregation"). "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

Furthermore, agencies must comply with the heightened requirement imposed by the FOIA Improvement Act ("2016 Amendment"). The 2016 Amendment to FOIA added a "foreseeable harm" requirement, which directs agencies to withhold information only where it "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A). In other words, it is no longer enough for the agency to establish that the material is covered by a statutory exemption; it must also meet an "independent and meaningful burden" to show harm from disclosure. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021); *see also Seife*, 43 F.4th at 240 (noting that the Act "poses an additional burden on the withholding agency"). "[B]road, hedging statements" do not suffice to establish foreseeable harm, *Seife*, 43 F.4th at 243, nor do "boilerplate and generic assertions," *Reps. Comm.*, 3 F.4th at 370.

II.    **The FBI's Public Declaration Fails to Provide a Basis for Withholding the BAU Report in Full**

The FBI has not met its burden to establish a sufficient factual record to justify withholding the BAU Report in its entirety. On that basis, alone, the agency's motion for summary judgment should be denied.

A.    **The Government's Claimed Exemptions Require Certain Factual Showings**

The two primary exemptions the FBI has asserted—Exemptions 7(A) and 7(E)—require it to make certain showings based on a factual record to justify withholding. Both exemptions require a threshold showing that the BAU Report was "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), meaning that the record is "related to the enforcement of federal laws or to the maintenance of national security." *Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982). It is not enough simply to say the records are in the possession of or were created *by* a law enforcement agency: courts have rejected the argument that FBI records *per se* satisfy the threshold inquiry under Exemption 7. *Id*. at 414-16.

To justify withholding under Exemption 7(A), the agency must also show "that the production of such law enforcement records or information  . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To meet that standard, an agency must introduce facts showing that (1) a law enforcement proceeding is pending or prospective; and (2) that release of information about it could reasonably be expected to cause some articulable harm. *Kay v. FCC*, 976 F. Supp. 23, 37 (D.D.C. 1997), *aff'd without op.*, 172 F.3d 919 (D.C. Cir. 1998).

This requires concrete evidence. *Juarez v. DOJ*, 518 F.3d 54, 58 (D.C. Cir. 2008); *see also Citizens for Resp. & Ethics in Wash. v. DOJ* ("*CREW*"), 658 F. Supp. 2d 217, 229-30 (D.D.C. 2009) (explaining that accepting hypothetical proceedings would be in direct

9

contravention of basic FOIA policy); *Majuc v. DOJ*, 2019 WL 4394843, at *3 (D.D.C. Sept. 13, 2019) (holding that an agency may not be granted summary judgment when there is "glaring ambiguity" as to "whether a related investigation is in fact ongoing." (citing *CREW*, 746 F.3d at 1099))).

Moreover, Exemption 7(A) is "temporal in nature." *CREW*, 746 F.3d at 1097. Showing that an investigation was active in the past is not enough. For the exemption to apply, a "proceeding must remain pending at the time of [the court's] decision, not only at the time of the initial FOIA request." *Id*. And a requester may be entitled to agency records under FOIA where the agency's investigation is "either concluded or abandoned." *CNN v. FBI*, 293 F. Supp. 3d 59, 77 (D.D.C. 2018).

Exemption 7(E), in turn, requires the agency to prove that the records would disclose law enforcement techniques or procedures. *See* 5 U.S.C. § 552(b)(7)(E). But Exemption 7(E) does not apply to *all* investigative and law enforcement techniques. To gain Exemption 7(E)'s protection, an agency must set forth facts showing that the record would reveal techniques and procedures not "already well-known to the public." *Founding Church of Scientology of D.C. v. NSA*, 610 F.2d 824, 832 n.67 (D.C. Cir. 1979); *see also Schwartz v. DEA*, 2016 WL 154089, at *10 (E.D.N.Y. Jan. 8, 2016) (noting that pretext phone calls and polygraph tests are "widely known technique[s]"); *ACLU v. DOJ*, 2014 WL 956303, at *7 (S.D.N.Y. March 11, 2014) ("Law enforcement's use of GPS tracking is well known by the public."); *Allard K. Lowenstein Int'l Hum. Rights Project v. DHS*, 603 F. Supp. 2d 354, 363 (D. Conn. 2009) (ordering release of "general outline of the operational steps" because it "would not reveal specific operational techniques"), *aff'd*, 626 F.3d 678 (2d Cir. 2010). Courts have specifically held that asking routine law enforcement questions does not amount to a protected technique or procedure under

10

Exemption 7(E). *ACLU v. DHS*, 243 F. Supp. 3d 393, 403 (S.D.N.Y. 2017) ("CBP has not established that there is anything technical about the questions asked, that any special method or skills are being used, or that children who were subjected to questioning would not thereby learn the 'technique' that CBP wishes to keep secret." (denying summary judgment to agency under Exemption 7(E))).

In order to properly rely on Exemption 7(E), the FBI also must show that disclosing the technique or procedure "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). That is, the agency must introduce facts suggesting that bad actors could use the information contained in the record to alter their conduct to evade detection. The Second Circuit has held that the circumvention requirement only applies to Exemption 7(E)'s clause on "guidelines for law enforcement investigations or prosecutions," *Lowenstein*, 626 F.3d at 681, but the 2016 Amendment to FOIA, which imposed a "foreseeable harm" requirement upon all of FOIA's exemptions, clarifies that the circumvention requirement applies to the "techniques and procedures" clause as well. *See Reps. Comm. for Freedom of the Press v. CBP* ("*CBP*"), 567 F. Supp. 3d 97, 128 (D.D.C. 2021) (noting that the foreseeable harm requirement as applied to Exemption 7(E) independently "guard[s] against general explanations and boilerplate language used to justify withholdings."). Congress's intent in enacting Exemption 7(E) was to "to prevent publication of information that would 'train potential violators to evade the law or instruct them how to break the law,' and to protect information that, if disclosed, 'increase[s] the risks that a law will be violated or that past violators will escape legal consequences.'" *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 405 F. Supp. 3d 127, 145 (D.D.C. 2019). Consequently, Exemption 7(E) is "inappropriate if there is no risk that a law could be violated." *Tushnet v. ICE*, 246 F. Supp. 3d 422, 437 (D.D.C. 2017).

11

It follows that all those requirements are highly fact-dependent and the Government, to carry its burden, must present facts that—while not disclosing secrets—are sufficient to show entitlement to the exemption. *Doherty v. DOJ*, 775 F.2d 49, 53 (2d Cir. 1985) (assessing government's claimed exemptions under standard of whether it had established an "adequate factual basis").

### B.    The FBI Fails to Make the Factual Showings Required by Exemption 7

The FBI's public declaration is remarkably cursory. It provides no facts about the BAU Report: when the investigation was commenced; how long the investigation lasted; when the final report was published; whether investigators conducted original research or (like other agencies) worked off the Miami, Pennsylvania, and Dalhousie data; whether the BAU had access to individual case studies or (like the NASEM Report) only received anonymized and aggregate patient data; whether the investigators rejected the idea that a crime had been committed, as has been reported. None of those facts would disclose anything secret but are essential to assessing whether disclosure of some part of the report would inflict the harms envisioned by Exemption 7. A report that is out of date, or a report that finds no crime, or a report that involved only a review of medical data and interviews and is clinical rather than criminal in focus cannot be squared with the requirements of Exemption 7.

Particularly deficient is the FBI's claims of the harms that would arise from disclosure. Here, the FBI has made only boilerplate, generic statements of harm that courts have found insufficient. The FBI claims that withholding is warranted under Exemption 7(A) because disclosure of the BAU Report would "provide substantial information about what the FBI knew and did not know regarding Anomalous Health Incidents at the time the BAU report was drafted." Seidel Decl. ¶ 20. The same can be said about any record. And of course, what the agency knew at one point in time is not necessarily the whole of what the agency knows now.

12

The FBI's declarant also states that the agency "cannot provide further detail about the investigation in a public setting as it would interfere with enforcement proceedings," and that it "cannot further describe the specific nature or extent of the interference, as the public disclosure of such information would itself harm enforcement proceedings." Seidel Decl. ¶ 18. This argument is little more than a recitation of the Exemption 7(A) statutory language.

The FBI's arguments for withholding under Exemption 7(E) are similarly boilerplate and vague. It says merely, "Revealing when and why the FBI pursues or shifts investigative focuses would reveal key information about the types of investigative intelligence the FBI possessed at particular points in time, and when and how such information was obtained." Seidel Decl. ¶ 27. It also says that producing the report would "reveal FBI methodologies utilized as tradecraft for intelligence analysis," such as "how the FBI's BAU collects information in response to certain events and the steps the BAU takes to analyze that information, including the various types of research the BAU undertakes as part of its analysis and the types of witnesses the BAU determines may have relevant information." Gov't Br. at 11. The FBI employs the cryptic phrases "tradecraft for intelligence analysis" and "various types of research" to say much without saying anything at all.

The deficiencies in the FBI's case are particularly stark in light of the fact that the 2016 Amendment to FOIA added a "foreseeable harm" requirement, which directs agencies to withhold information only where it "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A). In other words, it is no longer enough for the agency to establish that the material is covered by a statutory exemption; it must also meet an "independent and meaningful burden" to show harm from disclosure. *Reps. Comm. v. FBI*, 3 F.4th at 369; *see also Seife*, 43 F.4th at 240 (noting that the Act "poses an additional burden on

13

the withholding agency"). What this means is that agencies must articulate the harm from disclosure in a "focused and concrete" way. *Reps. Comm.*, 3 F.4th at 370; *see also CBP*, 567 F. Supp. 3d at 109-10 (surveying caselaw). Agencies cannot rely on "mere 'speculative or abstract fears,' *or fear of embarrassment*" to withhold information. *Reps. Comm.*, 3 F.4th at 369 (emphasis added). U.S. Attorney General Merrick Garland wrote in a memorandum on FOIA guidelines, "Information that might technically fall within an exemption should not be withheld from a FOIA requester unless the agency can identify a foreseeable harm or legal bar to disclosure. In case of doubt, openness should prevail." *FOIA Guidelines*, Office of the Att'y Gen. (Mar. 15, 2022), https://tinyurl.com/4at368tb, at 1.

For the material withheld under 7(A), the FBI must prove not only that there is a concrete, prospective law enforcement proceeding, but must also articulate specifically how release of the BAU Report would cause foreseeable harm. That disclosure of the BAU Report would "jeopardize the on-going counterintelligence investigation by undermining the FBI's investigatory efforts" is not nearly enough. Seidel Decl. ¶ 20. The FBI punts on the issue of articulating harm from disclosure under 7(A), claiming that "describ[ing] the specific nature or extent of the interference … would itself harm enforcement proceedings," but it never says what type of harm would result. Seidel Decl. ¶ 18. The same can be said for the FBI's justification under 7(E). The FBI argues that disclosure "would enable adversaries to exploit proprietary tactics, techniques, and procedures (TTPs) and provide them with valuable insight into global threat analysis," Seidel Decl. ¶ 25, but the FBI's public submissions have not established that the tactics, techniques, and procedures it employed in drafting the BAU Report entailed anything beyond routine questioning, reviewing medical records, or techniques already well known by the

14

public. The FBI's descriptions of harm are boilerplate and non-specific. The FBI expects Plaintiff to accept its threadbare explanations at face value, but FOIA requires more.

The cases Defendant relies upon for withholding are so factually dissimilar from this case that they do not support the agency's position. Defendant cites *Mermerlstein v. DOJ*, 2021 WL 3455314, at *12 (E.D.N.Y. Aug. 4, 2021) for the proposition that disclosing records "'would reveal information concerning pending enforcement proceedings' that would, among other things, 'provide criminals with information about the government's investigation and enforcement strategies in ongoing matters' and 'allow them to predict and potentially thwart these strategies.'" Gov't Br. at 9-10. But the agency in that case applied Exemption 7(A) in a much more limited fashion than the FBI has done here. In *Mermerlstein*, the FBI withheld under Exemption 7(A) only the case file numbers, and released redacted versions of the four documents over which it asserted the exemption, out of a total 2,159 responsive documents. *See* No. 19-cv-312 (E.D.N.Y.), Dkt. 22 ¶¶ 4, 81; Dkt. 22-14. The FBI in *Mermerlstein* also asserted Exemptions 6 and 7(C) to three of the four documents over which it asserted Exemption 7(A), but the agency *still* released redacted versions of the records. No. 19-cv-312, Dkt. 22-14.

*Clevenger v. DOJ*, 2020 WL 1846565, at *13 (E.D.N.Y. Apr. 3, 2020) also does not support the FBI's categorical withholding. In *Clevenger*, the FBI redacted three pages of documents under Exemption 7(A), and released the rest of the records with redactions pursuant to Exemptions 7(A) and 7(E). No. 18-cv-1568 (E.D.N.Y.), Dkt. 37-1, Ex. W at C-1. Defendant here has not come even close to engaging in the type of segregability analysis the agency conducted in *Mermelstein* or *Clevenger*.

It is possible that the FBI provided detailed, factual justifications to the Court *in camera*, but that does not excuse an agency from making as public of a case as possible so a FOIA

15

requester has the opportunity to provide a meaningful response. *Wilner v. NSA*, 592 F.3d 60, 68 (2d Cir. 2009) ("The court should attempt to create as complete a public record as is possible") (quotation omitted). That is especially so if, as reported, the BAU did not conduct clinical or investigatory work but relied on third party evidence, and the conclusion of the BAU Report is that Havana Syndrome is a function of mass psychosis—not a crime.

### III.    The FBI Fails to Show Why Redaction is Not Feasible to Address Exempt Material

The FBI takes the position that not a single word of the report can be released. That position is impossible to square with the extensive disclosures that the Government has made in other reports by other agencies on Havana Syndrome. If information has already been made public, there is no basis for claiming it is secret here. *Florez v. CIA*, 829 F.3d 178, 186-87 (2d Cir. 2016). Simply put, the FBI also has failed to show why redaction is not feasible to address any exempt material.

The FBI's approach here is even more secretive than the intelligence services', which at least declassified and published the executive summary of their report on Havana Syndrome, IC Report, *supra*, and stands in obvious contrast to the many other agencies that have disclosed information about their investigations and analyses of Havana Syndrome. Reports released by other agencies that have investigated Havana Syndrome have disclosed a significant amount of information about the medical symptoms and factual circumstances giving rise to Havana Syndrome; the number of people affected and the nature of their injuries; the treatment they received and the agencies involved; the clinical tests and investigatory techniques applied to their symptoms; the results of those clinical tests and examinations; the proposed chemical, biological, or technological agents that could cause such symptoms; and the techniques used to examine and discount or credit those various potential agents.

16

For example, the released DOS JASON report, which is 98 pages long, provides a detailed analysis of the possible causes of Havana Syndrome, including whether it was a function of "psychogenic illness." The investigation analyzed embassy employee interviews, audio recordings of sounds that alleged victims recorded in real-time, alleged victims' descriptions of perceived sensations, and medical evaluations conducted by the University of Pennsylvania. DOS JASON Report at 12-15. The DOS JASON Report describes in great detail the tests it performed of the sound recordings to identify their source, such as acoustic frequency comparisons to the sounds emitted by portable generators, worn ball-bearings, and even insects. *Id*. at 32-49. The report also considers the results of these tests in conjunction with the specific allegations of victims and witnesses. *Id*. at 16. The report includes the mathematical formulas it used to conduct its experiments. *Id*. at 64.

Similarly, the CDC Report provides such detailed data as the ages of affected individuals, their genders, the number of documented symptoms, the length of time they spent in the country where their symptoms arose, and whether DOS personnel were on temporary duty or had made a permanent change of station. CDC Report at 11.

Released reports demonstrate how redaction can ameliorate concerns that FOIA's exemptions are intended to protect. For example, the 104-page ARB Report's description of "adequacy of security" contains redacted paragraphs pursuant to Exemptions 1 and 3, but still discloses a considerable amount of information about the DOS's investigation. And the sections of the DOS JASON report describing its technical analysis of insect sounds and other experimental results contain several redacted paragraphs, citing Exemption 7(E), but pose little barrier to public understanding of its methodology and conclusions. DOS JASON Report at 34-42, 50-55.

IV.    **The State Department's Waiver of Exemption 7(E) Calls Into Question the FBI's Withholding On That Basis**

Before responding to the Request, the FBI consulted the DOS concerning the BAU Report. Seidel Decl. ¶ 4. The DOS initially asserted Exemptions 7(C) and 7(E), *id*. ¶ 8, but the FBI states that "[u]pon further review of the BAU Report, DOS is withdrawing its assertion of FOIA Exemption 7(E)." *Id*. ¶ 11. The DOS's withdrawal suggests that it believes disclosure of the BAU Report would not reveal secret law enforcement techniques or procedures.

The FBI acknowledges the DOS's waiver, but does not explain why the DOS's waiver should not preclude the FBI from asserting it, particularly when the DOS may be expected to have a greater interest in these issues and greater familiarity with how intelligence operatives, state actors, and international criminals may benefit from the information or how it may affect the DOS's continuing operations overseas, including recent reports that DOS personnel continue to experience new cases of Havana Syndrome. *See* Entous, *supra*.

V.    **Information Subject to Exemptions 6 and 7(C) May Readily Be Redacted and Those Exemptions Are Not an Obstacle to Disclosure**

Defendant cites Exemptions 6 and 7(C) to withhold personally identifying information contained in the BAU Report. The Times acknowledges the potential privacy interests associated with the personal identities of FBI special agents, individuals affected by Havana Syndrome, and third-party witnesses. To the extent those legitimate concerns are used to trigger the privacy exemptions, The Times does not challenge them. But the appropriate solution is for the FBI to redact identifying details, not withhold entire sections of the report.

## CONCLUSION

For all the reasons set forth above, Plaintiff respectfully asks this Court for an order (i) denying Defendant's Motion and granting Plaintiff's Cross-Motion; (ii) directing the FBI to release the report at issue, subject to redaction for bona fide privacy concerns; (iii) awarding

Plaintiff the costs of this proceeding, including reasonable attorney's fees, as expressly permitted by 5 U.S.C. § 552(a)(4)(E); and (iv) granting such other and further relief as the Court deems just and proper, or alternatively, denying summary judgment, directing that the FBI to supplement the public record by submitting a more detailed affidavit, and directing the parties to then renew their motions for summary judgment.

Dated: New York, NY
        December 9, 2022

Respectfully submitted,

*/s/ David E. McCraw*
David E. McCraw
Dana R. Green
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Facsimile: (212) 556-1009
Email: mccraw@nytimes.com

*Counsel for Plaintiff*

Of Counsel:

Samantha Hamilton
(Not Admitted in S.D.N.Y.)

19